UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**ZAID MOHAMMAD MAHDAWI,**<br><br>Defendant. | Case No. 24-cr-535 (JEB) |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

On July 24, 2024, the defendant, Zaid Mohammad Mahdawi, traveled from Richmond, Virginia, to Washington, D.C., where he and others defaced the Columbus Circle Monument causing upwards of $11,000 in damage. For the following reasons, the government requests that the Court sentence Mr. Mahdawi to thirty days of incarceration, followed by one year of supervised release, with a condition that he stay away from Federal museums and monuments, and pay restitution in the amount of $1,500.

**BACKGROUND**

Several groups applied for and were granted permits to demonstrate on the National Mall on July 24, 2024. An organization was granted a sole permit for the area of Columbus Circle, which is located at the intersection of Massachusetts Avenue Northeast and E Street Northeast, Washington, D.C., directly in front of Union Station. In anticipation of the demonstrations, members of the U.S. Park Police ("USPP"), U.S. Capitol Police ("USCP"), and the Metropolitan Police Department ("MPD") were present around Columbus Circle and other parts of downtown Washington, D.C.

Demonstrators began to gather in Columbus Circle starting at approximately 2:50 p.m. At approximately 3:26 p.m., the USPP revoked the permit that had been issued to the organization.

Pursuant to regulation, organizers must undertake, in good faith, all reasonable action to provide sufficient "marshals" to ensure good order and self-discipline during the demonstration. *See* 36 CFR 7.96 (g)(5)(xii). The USPP attempted to locate the organization's marshals multiple times but were unable to find them. At approximately 3:26 p.m., a USPP lieutenant called the individual permit holder. The permit holder failed to answer his phone, and the call went directly to voicemail. The USPP lieutenant left a voicemail officially revoking the organization's permit.

Despite the revocation of the permit, demonstrators, including the defendant, remained in and around Columbus Circle until approximately 5:00 p.m. From approximately 2:59 p.m. until 5:00 p.m., individuals in Columbus Circle pulled down flags affixed to the flagpoles; burned flags and objects; interfered with law enforcement's ability to place individuals under arrest; and sprayed graffiti on multiple statues and structures.

Between approximately 3:00 p.m. and 3:30 p.m., Mr. Mahdawi lowered a United States flag from one of the flagpoles in Columbus Circle. The flag was subsequently stolen by another individual. The flag was the property of the United States Government and was valued at approximately $575.



*Figure 1: Photo of Mr. Mahdawi, Circled at the Bottom of the Photo, Lowering the Flag*

Between approximately 3:30 p.m. and 3:45 p.m., after he had lowered the flag, Mr. Mahdawi climbed the monument located in the center of Columbus Circle. Just before scaling the monument, Mr. Mahdawi attempted to obscure his identity by wrapping a green cloth around his neck and pulling it over his nose to conceal part of his face.



*Figure 2: Mr. Mahdawi Before and After Covering His Face*

Mr. Mahdawi then pulled himself up to another level of the monument, beyond what is generally accessible by walking.



*Figure 3: Mr. Mahdawi Climbing the Statue in Columbus Circle*

4

Notably, Mr. Mahdawi started his climb from an area near ground level and was surrounded by other protestors. That level of the monument was easily accessible and was already covered with graffiti. Mr. Mahdawi then climbed to a difficult to reach area, where no other protestors were present, and which had not yet been defaced. As Mr. Mahdawi climbed, he carried with him a can of spray paint with a red cap.



*Figure 4: Mr. Mahdawi Climbing with a Spray Can*

After climbing to a ledge, Mr. Mahdawi spray-painted the monument.



*Figure 5: Mr. Mahdawi Spray Painting the Monument*

Mr. Mahdawi spray painted "HAMAS IS COMIN" across a side of the Columbus monument.



*Figure 6: Mr. Mahdawi After Writing "HAMAS IS COMIN"*

After completing the phrase, Mr. Mahdawi spray painted an inverted red triangle above the slogan.



*Figure 7: Mr. Mahdawi Posing with His Completed Vandalism*

The flags pulled down from the flag poles, and the statutes and structures in Columbus Circle are all property of the federal government. The National Park Service estimated that the total cost to clean up and repair the site was approximately $11,282.23.[1]

On October 2, 2024, the defendant was charged by complaint with one count of Destruction of Property (Less than $1,000), in violation of 18 U.S.C. § 1361. On January 23, 2025, the defendant pleaded guilty to that count pursuant to a plea agreement (ECF No. 15). In exchange, the government agreed not to pursue additional charges related to the conduct in the Statement of Offense (ECF No. 16) and capped its allocution at 30 days of incarceration, followed by one year of supervised release, and restitution. This sentencing memorandum follows.

---

[1] The National Park Service estimated the cost of damage by tallying the cost of the products purchased for cleanup (approximately 10 gallons of graffiti remover at $97.60 per gallon), $250 worth of rollers and cleaning brushes, as well as the labor costs associated with removal.

# ARGUMENT

## I. THE APPLICABLE SENTENCING GUIDELINES

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

In this case, the parties and U.S. Probation agree that the applicable starting point is U.S.S.G. § 2B1.5 (Theft of, Damage to, or Destruction of, Cultural Heritage Resources). *See* ECF Nos. 15, 18. However, the parties disagree on the specific offense characteristic related to value, as laid out below:

| Government's Calculation | | |
|---|---|---|
| Base Offense Level | 8 | U.S.S.G. § 2B1.5(a) |
| Value > $550,000 | +14 | U.S.S.G. § 2B1.1(b)(1)(H) |
| Custody of National Park Service/National Monument | +2 | U.S.S.G. § 2B1.1(b)(A)(2) |
| Total: | 24 | |

| Defendant's Calculation | | |
|---|---|---|
| Base Offense Level | 8 | U.S.S.G. § 2B1.5(a) |
| Value > $6,500 | +2 | U.S.S.G. § 2B1.1(b)(1)(B) |
| Custody of National Park Service/National Monument | +2 | U.S.S.G. § 2B1.1(b)(A)(2) |
| Total: | 12 | |

8

Section 2B1.1 applies to offenses involving "Property Damage or Destruction." Subsection (c)(4) provides that: "if the offense involved a cultural heritage resource or a paleontological resource, apply § 2B1.5 (Theft of, Damage to, or Destruction of, Cultural Heritage Resources or Paleontological Resources[])." A "cultural heritage resource" is defined, *inter alia*, as "an object of cultural heritage, as defined in 18 U.S.C. § 668(a)(2)." USSG §§ 2B1.1, cmt. 1, 2B1.5, cmt 1. Section 668(a)(2) in turn defines "object of cultural heritage" as "an object that is . . . over 100 years old and worth in excess of $5,000 . . . or . . . worth at least $100,000." The Columbus Circle Monument was completed in 1912 based on a contract for $21,854.00. Valued in today's dollar, the Monument is worth approximately $703,930.72[2], which satisfies either prong.

Moreover, the offense clearly "involved" the Columbus Circle Monument because the defendant used spray paint to deface the Monument itself, as well as lowering a flag from one of its flagpoles. Although the term "involved" is not defined in the Guidelines, it takes on its plain meaning. *See United States v. Seefried*, 639 F. Supp. 3d 8, 10 (D.D.C. 2022) ("In interpreting the Sentencing Guidelines, the Court applies the ordinary tools of statutory interpretation and looks to the plain meaning of its terms."); *see also United States v. Williams*, No. CR 21-618 (ABJ), 2024 WL 1239989, at *2 (D.D.C. Mar. 22, 2024) (looking "to the plain meaning of the term at the time the provision was enacted" in interpreting the meaning of a Sentencing Guidelines provision).

This interpretation is consistent with the broad purpose animating the addition of the Cultural Heritage Resource Guideline. Section 2B1.5 was added to the Guidelines in 2002. In explaining the amendment, the Sentencing Commission stated:

---

[2]     The estimated value of the Monument was calculated using a tool available through the Bureau of Labor Statistics: https://www.bls.gov/data/inflation_calculator.htm.

> This amendment reflects the Commission's conclusion that the existing sentencing guidelines for economic and property destruction crimes are inadequate to punish in an appropriate and proportional way the variety of federal crimes involving the theft of, damage to, destruction of, or illicit trafficking in, cultural heritage resources. The Commission has determined that a separate guideline, which specifically recognizes both the federal government's long-standing obligation and role in preserving such resources, and the harm caused to both the nation and its inhabitants when its history is degraded through the destruction of cultural heritage resources, is needed.

Amendment, FCJ Federal Sentencing Guidelines Manual Amendment 638 (11/1/13). The Commission further explained: "[t]he higher base offense level represents the Commission's determination that offenses involving cultural heritage resources are more serious because they involve essentially irreplaceable resources and cause intangible harm to society." *Id.*

### *Specific Offense Characteristic – U.S.S.G. § 2B1.1(b)(1)*

While the defense and U.S. Probation agree that Section 2B1.5 is the relevant guideline, they dispute the number of levels allotted under subsection 2B1.5(b)(1), and by cross reference Section 2B1.1(b)(1). The defense and U.S. Probation's calculation is based on the cost of the damage instead of the value of the cultural heritage resource. *See generally* ECF No. 18 at 6. The government submits that it is the latter that drives this specific offense characteristic.

Section 2B1.5(b)(1) provides: "[i]f the value of the cultural heritage resource or paleontological resource (A) exceeded $2,500 but did not exceed $6,500, increase by **1** level; or (B) exceeded $6,500, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount." The value of the resource "shall include" "as applicable": (i) the archaeological value; (ii) the commercial value; (iii) the cost of restoration and repair. U.S.S.G § 2B1.5, cmt. 2A. In other words, given the importance of these resources,

the Guideline specifically calls for a broader valuation than one solely based on restoration and repair.[3]

In *United States v. Haggerty*, the Fifth Circuit rejected the argument that the restoration value should control. No. 20-50203, 2021 WL 1827316 (5th Cir. May 7, 2021), *cert. denied,* 142 S. Ct. 759, 211 L. Ed. 2d 475 (2022). There, a defendant poured red paint on a statute of an American Indian. *Id.* at 301. In sentencing, the defendant argued that, where a resource "is restored to its prior physical condition[,] it is error to use the total value of that resource in calculating the offense level under USSG § 2B1.5; rather, the court should use the cost of restoration incurred in bringing the resource back to its prior condition." *Id.* at 303 (internal quotations omitted).

The Fifth Circuit found that the argument failed and relied on the total value of the statute based on its purchase price ($92,000) rather than the repair cost ($1,800). *See generally id.* The Fifth Circuit explained, "[t]here is nothing that suggests that 'the cost of restoration or repair" takes precedence over and obviates the other two valuations." *Id.* at 304. The Sentencing Commission's explanation for the new Guideline further undercut the defendant's arguments: "[T]he Commission makes it clear that the harm that it is concerned about when it comes to the damage and destruction of cultural heritage resources is not purely (or even primarily) the resource's physical condition or monetary value. Rather, the purpose of § 2B1.5 is to provide 'flexibility' to appropriately *punish* offenders for both the tangible and *intangible* harm caused by their damage of cultural heritage resources." *Id.* The Fifth Circuit noted that the Commission expressly elected not to use the concept of "loss," which was generally relied upon in property

---

[3] Indeed, the "court need only make a reasonable estimate of the value of the resource based on available information." U.S.S.G § 2B1.5, cmt. 2B.

11

destruction cases: "The Commission has elected not to use the concept of 'loss,' which is an integral part of the theft, fraud, and property destruction guideline at § 2B1.1, because cultural heritage offenses do not involve the same fungible and compensatory values embodied in 'loss.'" *Id.* at 304. In conclusion, the Fifth Circuit found that the defendant's "argument would have us rewrite the text of § 2B1.5 in tension with the purpose behind its promulgation." *Id.* The Fifth Circuit rejected that invitation.

Notably, another judge in this District agreed with the Fifth Circuit in *United States v. Smith* (23-cr-182) (ABJ), *United States v. Green and Zepeda* (24-cr-62) (ABJ). In the *Smith* sentencing, Judge Jackson agreed that there was "a deliberate decision by the Commission not to look at the cost of repair or loss when you're talking about art or history or culture" and noted that, "[t]he whole point of this is to address the unique risks and intangible harms embodied in the conduct and the cause for a level that takes into account the fact that these items are not fungible, they cannot be replaced, they deserve special protection[.]" *United States v. Smith*, April 26, 2025 Sent. Tr. at 14:11-25. In that case, the value of the cultural heritage resource—the Degas statute called *Little Dancer*—was valued between $65 to $125 million. *Id.* at 15. Thus, Judge Jackson found that an additional 24 levels was appropriate. Judge Jackson applied a similar analysis in *United States v. Green and Zepeda*, where the defendants were found guilty of defacing a mural in the National Gallery as well as the U.S. Constitution. *United States v. Green and Zepeda* (24-cr-62) (ABJ) (D.D.C. Nov. 15, 2024).

Indeed, in a case involving another defendant who caused damage to the Columbus Circle Monument during the same incident as Mr. Mahdawi, this Court and U.S. Probation agreed with the government's calculation; namely, that a 14-level increase was appropriate based on the total

12

estimated value of the monument of $703,930.72. *See United States v. Giordano* (24-cr-441) (JEB) (D.D.C. Mar. 19, 2025) at ECF No. 29.

Thus, given the intent of the Commission and corresponding caselaw, the government calculates the defendant's guidelines in this case as 24. Because the defendant has accepted responsibility, he is entitled to a 2-level reduction pursuant to U.S.S.G. § 3E1.1, and a further 1-level reduction pursuant to U.S.S.G. § 3E1.1(b). Additionally, the defendant has no criminal history and therefore qualifies as a zero-point offender pursuant to U.S.S.G. § 4C1.1, and is entitled to an additional two-point reduction. His total combined offense level is therefore 19.

Mr. Mahdawi has one prior conviction:

| Case No. | Conviction Date | Offense | Sentence |
|---|---|---|---|
| Virginia – Richmond City Circuit Court No. GC23029507-00 | 5/8/24[4] | Trespass After Forbidden | Fine |

Thus, Mr. Mahdawi has a criminal history category of I. With a total offense level of 19, and a criminal history category of I, the applicable guidelines' range is 30 to 37 months' imprisonment—capped at the statutory maximum of 12 months' imprisonment. The Guideline range for supervised release is one year, U.S.S.G. § 5D1.2(a)(3), and the applicable fine is $10,000 to $100,000. U.S.S.G § 5E1.2.

## II.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In addition to the Guidelines, sentencing is further guided by 18 U.S.C. § 3553(a). Notably, the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A

---

[4] Mr. Mahdawi appears to have appealed and then withdrawn his appeal on September 5, 2024, which explains the different dates from the Pretrial Services Report and the Presentence Investigation Report.

sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. As described more fully below, on balance, the Section 3553(a) factors weigh in favor of a shorter period of incarceration, to be followed by a period of supervision.

### A. Nature and Circumstances of the Offense

Mr. Mahdawi traveled from Richmond, Virginia, to Washington, D.C. on July 24, 2024, presumably to partake in First Amendment protected activity. However, that demonstration devolved and culminated in the defendant defacing government property—in this case, an extremely valuable historical monument. Video footage of Columbus Circle that day depicts a crowd whose mood turned riotous—with individuals defacing and burning government property and verbally and physically assaulting police. And while there is no evidence that Mr. Mahdawi took any action against police, it was clear that the situation was out of hand and that the police were outnumbered and unable to stop the destruction. Instead of leaving when the protest turned riotous, Mr. Mahdawi not only remained, he contributed.

Mr. Mahdawi's conduct is distinct from other individuals who engaged in the destruction of property in several ways. First, Mr. Mahdawi lowered a flag from one of the monument's several flagpoles, which was carried off by another individual and not recovered. Subsequently, Mr. Mahdawi used spray paint in perhaps the most prominent act of vandalism that day. Indeed, Mr. Mahdawi pulled himself up the Monument to ensure his message stood out and was difficult to reach. Mr. Mahdawi then used red spray paint to deface a large area and highly visible area of the monument before posing proudly with his work. This area was undoubtedly one of the more difficult displays to clean based not only on its size but its placement.

The destruction of government property, including to a site with significant historical and monetary value, cannot be condoned. While Mr. Mahdawi did not engage in violence against police, his vandalism was an intentional escalation beyond the acts of destruction of property by others. For that reason, the government submits that the nature of the offense favors at least a short period of incarceration followed by supervision.

### B. History and Characteristics of the Defendant

Although Mr. Mahdawi does not have a significant criminal history, this unfortunately was not the first occasion Mr. Mahdawi's conduct escalated to criminal activity during a demonstration. Mr. Mahdawi was previously arrested on two occasions for his role during protests shortly before this incident, on December 8, 2023, and April 7, 2024.

On December 8, 2023, Mr. Mahdawi was arrested by Virginia Commonwealth University ("VCU") Police Department officers for trespass. During a speaking engagement at the Student Commons, VCU staff and the speaker complained that there was an individual in the crowd causing a disturbance and asked that he be removed. Mr. Mahdawi was identified as causing the disturbance, and VCU police officers requested he leave the property multiple times. Mr. Mahdawi refused each time, and told the police that he would have to be forcibly removed from the property. Mr. Mahdawi was escorted out by police but resisted leaving; indeed, he attempted to kick a door to prevent his removal. Mr. Mahdawi was charged with trespass and resisting arrest. On May 8, 2024, he was found guilty of the trespass charge and fined.

On April 7, 2024, Mr. Mahdawi was arrested by Richmond Police Department when police observed individuals blocking a road with bicycles and vehicles, impeding the flow of traffic. Police officers identified and approached the leader of the assembly, Mr. Zahdawi. They asked Mr. Mahdawi to disperse the assembly, but Mr. Mahdawi responded he would not do so.

Richmond Police Department declared the assembly unlawful twice, approximately fifteen minutes apart. Police officers then approached and arrested Mr. Mahdawi and detained him. He was charged with unlawful assembly and obstruction of justice without force.

Notably, the charges from April 7, 2024, were dismissed nolle prosequi on July 22, 2024, just *two days* prior to his conduct in this case. Moreover, only two months elapsed between Mr. Mahdawi being found guilty of the December 8, 2023 trespass at VCU and his conduct on July 24, 2024. It seems clear that the slaps on the wrist he previously received proved insufficient to dissuade Mr. Mahdawi from engaging in further criminal behavior. Given Mr. Mahdawi's repeated refusal to engage in lawful behavior at First Amendment demonstrations, the Government submits that the history and characteristics of the defendant weigh in favor of a short period of incarceration followed by supervision.

### C. Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The defendant is charged with one count of Destruction of Property (Less Than $1,000)—a misdemeanor. Relative to the other crimes committed on July 24, 2024, including assaulting police officers, the defendant's actions were not the most serious. However, as indicated above, Mr. Mahdawi engaged in two distinct acts of destruction of government property. Further, Mr. Mahdawi's vandalism of the monument was a deliberate escalation above the prior acts of graffiti, both in scale and prominence. Mr. Mahdawi climbed to an area that was difficult to reach and spray-painted a message significantly larger than himself in an area that was previously clear of any damage. Thus, Mr. Mahdawi's actions deserve more than the probationary sentence that other less deliberately serious acts of graffiti have earned other defendants.

### D. The Need for the Sentence to Afford Adequate Deterrence

The requested sentence is sufficient but no greater than necessary to meet the goals of

sentencing. The need for general deterrence in this case is significant. In Washington, D.C., demonstrations take place every day. By and large, those demonstrations are peaceful. However, the potential for escalation to destruction of property or violence is always present where large groups come together, and the more extreme tactics of certain individuals are fueled by the riot mentality. In this case, the underling conduct was not aberrant. In fact, as noted above, Mr. Mahdawi had prior incidents shortly before the instant offense in which his conduct at demonstrations escalated to the point of arrest. Barely two months before, Mr. Mahdawi was convicted of trespass. And only two days before the instant offense, charges related to his conduct at a protest in Richmond, Virginia on April 7, 2024, were dismissed by prosecutors. Rather than drawing from his recent experiences to protest lawfully, Mr. Mahdawi's participation at the demonstration on July 24, 2024, escalated into blatantly criminal conduct that caused damage to government property. While the government credits Mr. Mahdawi's early acceptance of responsibility, a sentence with some detention appears necessary to specifically deter Mr. Mahdawi and generally deter others from partaking in this type of criminal activity in the future.

### III.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110

Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Here, the defendant was convicted of violations of an offense under Title 18; accordingly, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019)

(quoting 18 U.S.C. § 3663(a)(1)(B)(i)).  The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[5]

Here, the evidence shows that Mr. Mahdawi partook, along with many others, in spray-painting the monument and the removal of a flag in Columbus Circle.  Thus, his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses.  *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"); *see also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Mr. Mahdawi to pay $1,500 in restitution, which represents both the value of the flag he aided in removing and the large and prominent portion of the Monument damaged by his graffiti.  This amount fairly reflects the defendant's role in the offense and the damages resulting from his conduct.

---

[5]    Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

## **CONCLUSION**

For all of the foregoing reasons, the government requests a sentence of thirty days' imprisonment, followed by one year of supervised release, with a continued stay-away from Federal museums and monuments, and $1,500 in restitution.

Respectfully submitted,

EDWARD R. MARTIN, JR.
UNITED STATES ATTORNEY
D.C. Bar No. 481866

By:  */s/ Brendan M. Horan*
BRENDAN M. HORAN
Special Assistant U.S. Attorney
United States Attorney's Office for the
District of Columbia
N.Y. Bar No. 5302294
Brendan.Horan@usdoj.gov
(202) 730-6871